<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

—————————————————————
:
RAMADA WORLDWIDE INC., Formerly  :
known as Ramada Franchise Systems, Inc.,  :
a Delaware Corporation,                   :
                                 :          Civil Action No. 05-3452 (JAG)
        Plaintiff,         :
                                 :               **OPINION**
          v.               :
                                 :
BENTON HARBOR HARI OHM, L.L.C.,  :
a Michigan Corporation; VARSHA      :
PATEL, an Individual; SNEHAL PATEL,  :
an Individual; NILESH PATEL, an       :
Individual; and JYOTRINDA PATEL, an  :
Individual,                       :
                                 :
        Defendants.        :
—————————————————————:

<u>GREENAWAY, JR., U.S.D.J.</u>

This matter comes before this Court on the unopposed motion for default judgment against defendant "Benton Harbor Hari Ohm, [LLC]" ("Benton Harbor"), pursuant to FED. R. CIV. P. 55(b)(2), and the unopposed motion for summary judgment against defendants Snehal Patel, Varsha Patel, Nilesh Patel, and Jyotrinda Patel (collectively, the "Guarantors"), pursuant to FED. R. CIV. P. 56, by Plaintiff Ramada Worldwide, Inc. ("RWI").  For the reasons stated below, these motions shall be granted.

## I. <u>FACTS</u>

### A.   <u>The License Agreement</u>

RWI operates a guest lodging facility franchise system, which consists of various trade names, service marks, logos, and derivations thereof (the "Ramada Marks"), together with certain standards and centralized support functions, including a nationwide computer reservation system.[1]  (Aff. of Valerie Capers Workman ("Workman Aff.") ¶ 3.)  The hotels operating as part of the franchise system are all independently owned and operated.  (<u>Id.</u> ¶ 4.)  RWI allows its franchisees, pursuant to the terms of their respective franchise or license agreement, to operate their hotels as Ramada guest lodging facilities using the Ramada Marks.  (<u>Id.</u>)

On October 7, 2002, RWI entered into a licensing agreement (the "Licensing Agreement") with Benton Harbor for the operation of a 117 guest lodging facility located in Benton Harbor, Michigan (the "Facility").  (Ramada Franchise Systems, Inc. Franchise Agreement, attached as Ex. A-A to Workman Aff., at 1.)  The term of the License Agreement extended fifteen years from its effective date.  (<u>Id.</u> at 9.)

Benton Harbor was required to make renovations to the Facility that complied with "System Standards," as defined in the License Agreement.  (<u>Id.</u> at 2.)  The License Agreement obligated Benton Harbor to achieve and maintain certain scores on periodic quality assurance inspections conducted by RWI.  (<u>Id.</u> at 5.)  Specifically, RWI had the "unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark

---

[1]  RWI has the exclusive right to sublicense the use of the Ramada Marks, as well as its distinctive franchise system.  (Aff. of Valerie Capers Workman ("Workman Aff.") ¶ 5.)  RWI has continuously used each of the Ramada Marks since the date of their registration, and has given notice to the public of the registration of the Ramada Marks.  (<u>Id.</u>)

usage," as well as the "unlimited right to reinspect if the Facility does not achieve the score required on an inspection."  (Id. at 9.)

Benton Harbor was required to make certain periodic payments to RWI for royalties, marketing assessments, taxes, interest, reservation system assessments, and other fees (collectively, the "Recurring Fees").  (Id. at 10, 28.)  Benton Harbor also agreed to maintain accurate financial information, including books, records, and accounts for the Facility, and permitted RWI to examine, audit, and make copies of the entries in these books, records, and accounts.  (Id. at 4.)

Under Section 11.2 of the License Agreement, RWI could terminate the License Agreement, with notice to Benton Harbor, for various reasons, including when Benton Harbor "(or any guarantor) generally fail[s] to pay debts as they come due in the ordinary course of business"; fails to cure a default as provided in the Licensing Agreement; "discontinue[s] operating the facility as a 'Ramada'"; or "receive[s] two or more notices of default from [RWI] in any one year period (whether or not [Benton Harbor] cure[s] the default)."  (Id. at 13.)  Section 7.3 of the License Agreement provides that the defaulting party owes interest on any past due amount "at the rate of 1.5% per month, or the maximum rate permitted by applicable law, whichever is less, accruing from the date due until the amount is paid."  (Id. at 10.)

In the event that the Licensing Agreement was terminated, Benton Harbor agreed to "immediately stop" using all of the Ramada Marks.  (Id. at 16.)  Termination of the License Agreement allows RWI to enter the Facility, and paint over or remove part or all of any interior or exterior Ramada Mark bearing signage.  (Id.)  Benton Harbor must then reimburse RWI for the cost of removing or painting over such signage.  (Id.)

3

If the License Agreement is terminated, Benton Harbor must also pay liquidated damages to RWI within thirty days following the date of the termination, in accordance with a formula set forth in the Licensing Agreement.[2]  (Id. at 15.)  Benton Harbor would also have to pay an additional $1,000 in liquidated damages to RWI under the terms of the Addendum to the Agreement for Satellite Connectivity Services (the "Satellite Addendum").  This liquidated damages amount is paid in place of RWI's claims for lost future monthly service charges due under the Satellite Addendum, and the costs of uninstalling the equipment.  (Addendum to the License Agreement for Satellite Connectivity Services, attached as Ex. A-H to Workman Aff., at § 13(c).

Section 17.3 of the License Agreement stipulates that the "[r]emedies specified in the Agreement are cumulative and do not exclude any remedies available at law or in equity."  (Ex. A-A at 20.)  It also expresses that "[t]he non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement."  (Id.)

Effective as of the execution date of the License Agreement, the Guarantors provided RWI with a guaranty of Benton Harbor's obligations under the License Agreement (the "Guaranty").  (Guaranty, attached as Ex. A-B to Workman Aff.)  The Guarantors agreed, inter alia, that, upon default by Benton Harbor and notice from RWI, they would "immediately make each payment and perform or cause [Benton Harbor] to perform, each unpaid or unperformed obligation of [Benton Harbor] under the [License] Agreement."  (Id.)  The Guaranty adopts by

---

[2]  Section 18.4 of the License Agreement established the liquidated damages calculation as $1,000 for each guest room that Benton Harbor was authorized to operate at the time of termination.  (Id. at 23.)

4

reference Section 17 of the License Agreement. (Id.; Ex. A-A at 20.)

**B.      Benton Harbor's Breach of the License Agreement**

Beginning in 2004, Benton Harbor repeatedly failed to operate the Facility in accordance with RWI's System Standards, in breach of its obligations under the License Agreement. (Workman Aff. ¶ 26.)  On June 6, 2004, Benton Harbor received a failing score on the Facility's quality assurance inspection.  (Quality Assurance Evaluation Report dated June 6, 2004, attached as Ex. A-C to Workman Aff., at 1.)  On October 28, 2004, RWI conducted another quality assurance inspection of the Facility, and Benton Harbor received its second consecutive failing score.  (Quality Assurance Evaluation Report dated Oct. 28, 2004, attached as Ex. A-D to Workman Aff., at 1.)

On November 19, 2004, RWI sent a letter to Benton Harbor explaining that it was in default of its obligations under the License Agreement, due to its failure to maintain the quality assurance inspection score required under the License Agreement.  (Letter to Ms. Vicki Patel dated Nov. 19, 2004, attached as Ex. A-E to Workman Aff.)  The letter informed Benton Harbor of its obligation to cure the default within thirty days.  (Id.)  If the default was not cured, the letter stated, then the License Agreement may be subject to termination.  (Id.)

The letter also provided formal notice to Benton Harbor of its default under the License Agreement, for failing to pay $20,169.77 in Recurring Fees and other charges related to its operation of the Facility.  (Id.)  The letter explained to Benton Harbor that the License Agreement may be subject to termination, if this amount was not paid within thirty days.  (Id.)

On December 21, 2004, RWI conducted a third quality assurance inspection of the Facility; the Facility received another failing score.  (Quality Assurance Evaluation Report dated

Dec. 21, 2004, attached as Ex. A-F to Workman Aff., at 1.)

In a letter dated December 29, 2004, RWI informed Benton Harbor that it was terminating the License Agreement, effective immediately.  (Letter to Ms. Vicki Patel dated Dec. 29, 2004, attached as Ex. A-G to Workman Aff.)  As a result, RWI stated, Benton Harbor must perform its post-termination obligations, including the "de-identification procedures" set forth in the attachment to the letter, within fourteen days of the date of the letter.[3]  (Id.)  RWI advised that Benton Harbor must also immediately pay its outstanding balances, including (1) $22,824.35 in unpaid Recurring Fees; (2) $117,000 in liquidated damages, as specified in the License Agreement; (3) $1,000 in liquidated damages, as specified in the Satellite Addendum; and (4) all other charges due under the License Agreement through the date of the completion of the de-identification process, including removal of all signage and other items bearing the Ramada Marks.  (Id.)

Since the termination of the License Agreement, Benton Harbor has used the Ramada Marks to induce the public to rent guest rooms at the Facility.  (Workman Aff. ¶ 34.)  Benton Harbor failed to remove Ramada primary signage or additional exterior signage.  (Id. ¶ 35.)  RWI conducted post-termination inspections on April 11, October 13, November 1, and December 7 of 2005; on June 16 and October 5 of 2006; and on June 23, 2007, each of which revealed that Benton Harbor failed to remove exterior signage advertising the Facility as a Ramada guest lodging facility.  (Post-Termination Obligations Checklists, attached as Ex. A-I, B, C, D, E, F, and G of the Workman Aff.)

---

[3] Termination of the License Agreement precludes Benton Harbor from any further use of the Ramada Marks in or around the Facility.  (Ex. A-A at 16.)

## II.  <u>STANDARD OF REVIEW</u>

### A.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Cascara v. Pomeroy</u>, 313 F.3d 828, 832-33 (3d Cir. 2002).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  This Court shall "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  <u>Andreoli v. Gates</u>, 482 F.3d 641, 647 (3d Cir. 2007) (citation omitted).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . ."  <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (quoting <u>Anderson</u>, 477 U.S. at 255).

When the moving party has the burden of proof on an issue at trial, that party has "the burden of supporting their motions 'with credible evidence . . .  that would entitle [them] to a directed verdict if not controverted at trial.'"  <u>In re Bressman</u>, 327 F.3d 229, 237 (3d Cir. 2003) (quoting <u>Celotex</u>, 477 U.S. at 331); <u>see also</u> <u>United States v. Four Parcels of Real Prop.</u>, 941 F.2d 1428, 1438 (11th Cir. 1991) ("When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." (emphasis in original)  (internal citations omitted).)

7

"[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. <u>Jersey Cent. Power & Light Co. v. Lacey Twp.</u>, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. <u>Anderson</u>, 477 U.S. at 248; <u>Siegel Transfer, Inc. v. Carrier Express, Inc.</u>, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." <u>Schoch v. First Fid. Bancorporation</u>, 912 F.2d 654, 657 (3d Cir. 1990); <u>see also</u> FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). "If the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." <u>Foster v. Morris</u>, 208 F. App'x 174, 179 (3d Cir. 2006).

## A.    <u>Default Judgment Standard</u>

Federal Rule of Civil Procedure 55(b)(2) governs the entry of default judgment. The rule states:

> In all other cases, the party must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of

8

the application at least 3 days before the hearing.  The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to:

> (A) conduct an accounting;
> (B) determine the amount of damages;
> (C) establish the truth of any allegation by evidence; or
> (D) investigate any other matter.

FED. R. CIV. P. 55(b)(2).  "The Federal Rules of Civil Procedure commit the entry of a default judgment against a party to the sound discretion of the trial court."  F.T.C. v. Packers Brand Meats, Inc., 562 F.2d 9, 11 (8th Cir. 1977).

"Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint."  United States v. Gant, 268 F. Supp. 2d 29, 32 (D.D.C. 2003) (citing Brock v. Unique Racquetball & Health Clubs, Inc., 786 F.2d 61, 65 (2d Cir. 1986)).  Default does not establish liability for the amount of damages claimed by the plaintiff.  Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation.").  "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty."  Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999).

The district court has considerable latitude in determining the amount of damages.  Jones v. Winnepesaukee Realty, 990 F.2d 1, 4 (1st Cir. 1993).  The district court may conduct a hearing to determine the damage amount.  FED. R. CIV. P. 55(b)(2).  The court is not required to do so, however, "as long as it ensure[s] that there [is] a basis for the damages specified in the default judgment."  Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111

(2d Cir. 1997).  "It is a familiar practice and an exercise of judicial power for a court upon

default, by taking evidence when necessary or by computation from facts of record, to fix the

amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly."

Pope v. United States, 323 U.S. 1, 12 (1944).

### III.  ANALYSIS

#### A.   Summary Judgment Motion

Under the terms of the License Agreement, applicable to the Guarantors by way of the

Guaranty, RWI seeks liquidated damages in the amount of $118,000; Recurring Fees in the

amount of $27,143.81; pre-judgment interest totaling $77,840.14; and reimbursement for

attorneys' fees and costs related to this suit.  Additionally, RWI requests treble damages in the

amount of $530,503.74 for violation of the Lanham Act.

1.   Breach of Contract Claim

a.   *Liability*

This Court shall construe the terms of the License Agreement under New Jersey contract

law, as both parties stipulated in the License Agreement that New Jersey law shall apply to its

construction and interpretation. (Ex. A-A at 20.)  A court's role in interpreting the terms of a

contract is to discern the parties' intentions.  Pacifico v. Pacifico, 920 A.2d 73, 77 (N.J. 2007).

"[I]n attempting to understand the parties' agreement, we turn to what they wrote and our

familiar policy that, absent more than one plausible interpretation, we enforce contracts as they

are written."  B.D. v. Div. of Med. Assistance & Health Serv., 937 A.2d 980, 984 (N.J. Super. Ct.

App. Div. 2007).  That is, courts must enforce the terms of contracts as written when such terms

are clear and unambiguous.  Malick v. Seaview Lincoln Mercury, 940 A.2d 1221, 1223 (N.J.

Super. Ct. App. Div. 2008) (citing <u>County of Morris v. Fauver</u>, 153 N.J. 80, 103 (1998)).

A guaranty is a form of a contract, and therefore is subject to the same rules of interpretation.  "[T]he terms of a guarantee agreement must be read in light of commercial reality and in accordance with the reasonable expectations of persons in the business community involved in transactions of the type involved."  <u>Ctr. 48 Ltd. P'ship v. May Dept. Stores Co.</u>, 810 A.2d 610, 619 (N.J. Super. Ct. App. Div. 2002).  "[A] guarantor is not bound beyond the strict terms of its promise."  <u>Mill Creek Mall, LLC v. Fabco Shoes Mill Creek, LLC</u>, 2007 WL 4481416, at *5 (N.J. Super. Ct. App. Div. Dec. 26, 2007).  Nevertheless, "[w]hile any ambiguity should be construed in favor of the guarantor, the agreement should be interpreted according to its clear terms so as to effect the objective expectations of the parties."  <u>Ctr. 48 Ltd. P'ship</u>, 810 A.2d at 619.

The terms of the License Agreement and the Guaranty are clear and unambiguous and, when interpreted by this Court, reveal that both Benton Harbor and the Guarantors have breached their respective obligations under the aforementioned contracts.  RWI may terminate the License Agreement if Benton Harbor does not cure a default, which, as delineated in Section 11.1, includes a failure to make a payment, and a failure to perform obligations required under the License Agreement.  The Facility received a failing score on its quality assurance inspection on three separate occasions in 2004.  Benton Harbor also failed to pay $20,169.77 in Recurring Fees.  It received notice of these defaults in a letter from RWI dated November 19, 2004.  Benton Harbor had thirty days to cure its defaults, but failed to take any remedial action.  As a result, RWI informed Benton Harbor of its decision to terminate the License Agreement, effective December 29, 2004.

After Benton Harbor failed to cure its defaults, the Guarantors became obligated under the terms of the Guaranty to pay or perform these obligations. The Guaranty is an enforceable contract, since it was signed in order to induce RWI to enter into the License Agreement with Benton Harbor. See Great Falls Bank v. Pardo, 622 A.2d 1353, 1359 (N.J. Super. Ct. Ch. Div. 1993) (noting that a guaranty that is not executed at the same time as the contractual agreement must be supported by separate consideration). RWI attests that the Guarantors have failed to fulfill their obligations. The Guarantors, who have not responded to the instant motion, have not presented any contradictory evidence. Therefore, they shall be held liable for Benton Harbor's breach of the License Agreement, as well as any other legal remedies that RWI may claim against Benton Harbor.

    b.    *Damages*

After establishing that the Guarantors may be held liable for Benton Harbor's breach of contract, this Court shall next turn to the issue of damages associated with this breach. The liquidated damages clause in the License Agreement is enforceable, and entitles RWI to $118,000 in damages. New Jersey courts have held that "such clauses should be deemed presumptively reasonable and that the party challenging such a clause should bear the burden of proving its unreasonableness." Wasserman's Inc. v. Twp. of Middletown, 645 A.2d 100, 108 (N.J. 1994). The party against whom liquidated damages are sought carries the burden of showing that the liquidated damages provision amounts to a penalty. Id.

The purpose of the liquidated damages provision in the License Agreement is to compensate RWI for damages it suffered from the premature termination of the License Agreement. (Workman Aff. ¶ 41.) "Liquidated damages are paid in place of [RWI's] claims for

12

lost future Recurring Fees under this Agreement." (Ex. A-A at 15.)  Section 18.4 of the License

Agreement clearly and unequivocally expresses the parties' agreement that, in the event the

License Agreement is terminated, Benton Harbor shall be liable in the amount of $1,000 for each

of the 117 guest rooms it was authorized to operate at the time of the contract's termination, or

$117,000.  The Satellite Addendum also provides that Benton Harbor owes an additional $1,000

in liquidated damages to RWI, for a total of $118,000.  By way of the Guaranty, the Guarantors

are therefore required to pay $118,000 in liquidated damages to RWI.

RWI is also entitled to an award of damages for $27,143.81 in Recurring Fees owed by

Benton Harbor.  Section 7 of the License Agreement outlines the various Recurring Fees that

Benton Harbor was obligated to pay, which included royalties, reservation system fees, and taxes.

(Ex. A-A at 10.)  Under the terms of the Guaranty, if Benton Harbor failed to make a payment

due under the terms of the License Agreement, the Guarantors became obligated to procure

Benton Harbor's performance, or pay the fee themselves.  (Ex. B.)

The outstanding Recurring Fees owed by Benton Harbor are itemized in a statement

attached to the Affidavit of Valerie Capers Workman.  (Itemized Statement, attached as Ex. I to

Workman Aff.)  The Guarantors are therefore liable in the amount of $27,143.81, exclusive of

interest.

This Court shall also grant RWI an award for pre-judgment interest totaling $92,011.  The

trial court may award pre-judgment interest to a prevailing party, at its discretion.  County of

Essex v. First Union Nat'l Bank, 891 A.2d 600, 608-09 (N.J. 2006); Meshinsky v. Nichols Yacht

Sales, Inc., 541 A.2d 1063, 1070 (N.J. 1988).  It is well settled that pre-judgment interest may be

awarded in breach of contract claims.  Meshinsky, 541 A.2d at 1070.

13

Section 7.3 of the License Agreement requires Benton Harbor to pay interest at the rate of 1.5 percent per month on "any past due amount payable to [RWI] . . . ." (Ex. A at 10.) The interest shall accrue from "the due date until the amount is paid." (Id.) As a result, this Court finds that the Guarantors must pay interest on the liquidated damages for the period between January 28, 2005[4] and January 14, 2008,[5] in the amount of $62,961.58. The Guarantors must pay an additional $11,521.62 for the interest that accrued from January 14, 2008 to the date of this Order, July 30, 2008.

RWI is also entitled to receive pre-judgment interest for the period between December 29, 2004 through January 14, 2008 for the Recurring Fees owed by Benton Harbor, in the amount of $14,878.56. This Court also orders the Guarantors to pay an additional $2649.24 for the interest that accrued on the Recurring Fees from January 14, 2008 to July 30, 2008, the date of this Order.

Last, Plaintiff requests reimbursement for attorneys' fees and costs associated with this litigation. New Jersey permits a prevailing party to recover attorneys' fees and expenses in connection with a claim based on a contract, if the contract so provides. Packard-Banberger & Co. v. Collier, 771 A.2d 1194, 1200 (N.J. 2001); Litton Indus., Inc. v. IMO Indus., Inc., 2008 WL 215541, at *16 (N.J. Super. Ct. App. Div. Jan. 28, 2008). As the prevailing party, RWI is entitled to receive reimbursement for "all costs and expenses, including reasonable attorneys'

---

[4] RWI terminated the License Agreement on December 29, 2004; therefore, the unpaid liquidated damages became past due on January 28, 2005. (Ex. A at 15) ("If [RWI] terminate[s] the License under Section 11.2 . . . [Benton Harbor] will pay us within 30 days following the date of termination, as Liquidated Damages . . . .")

[5] January 14, 2008 was the return date for the instant motion.

fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts

owed under this Agreement." (Ex. A-A at 20.)  RWI may recover attorneys' fees and costs from

the Guarantors, as expressed in the Guaranty.  (Ex. A-B.)   However, RWI has not provided

sufficient documentation to inform this Court of the amount of its attorneys' fees and costs.  See

L. Civ. R. 53.2 (requiring an affidavit setting forth, inter alia: "(1) the nature of the services

rendered, . . . (2) a record of the dates of services rendered[,] (3) a description of the services

rendered on each of such dates by each person of that firm . . . (4) the time spent in the rendering

of each of such services[,] and (5) the normal billing rate for each of said persons for the type of

work performed.").  This Court shall reserve judgment on the amount of costs and expenses to

award RWI.

>        2.       Infringement Claim

>                a.       *Liability*

RWI seeks treble damages for Benton Harbor's continued use of the Ramada Marks after

the termination of the License Agreement.  The Lanham Act establishes a cause of action for

trademark infringement.  McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350,

357 (3d Cir. 2007).  To prove trademark infringement under the Lanham Act, "a plaintiff must

show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff;

and (3) the defendant's use of the mark is likely to create confusion concerning the origin of the

goods or services."  Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 470 (3d Cir.

2005).

It is indisputable that RWI possesses a valid and legally protectable mark.  RWI has the

exclusive right to sublicense the use of the Ramada Marks, as defined in the License Agreement.

RWI allowed its licensees to use the Ramada Marks, pursuant to the terms of the License Agreement, and expressly required a licensee to cease use of the Ramada Marks upon the termination of the License Agreement.  RWI reiterated this right to Benton Harbor in the letter dated December 29, 2004, in which RWI ordered Benton Harbor to cease using the Ramada Marks within fourteen days.

RWI has produced evidence showing that Benton Harbor continued to display the Ramada Marks, in violation of the License Agreement, from January 12, 2005, fourteen days after the License Agreement was terminated, up to at least June 23, 2007.  Specifically, RWI's post-termination inspections conducted on April 11, 2005; October 13, 2005; November 1, 2005; December 7, 2005; June 16, 2006; October 5, 2006; and June 23, 2007 revealed that Benton Harbor had failed to remove exterior signage advertising the Facility as a Ramada guest lodge. Benton Harbor's continued use of RWI's protected marks, in violation of the terms of the License Agreement, constitutes trademark infringement under the Lanham Act.

RWI is therefore entitled to receive an award for damages incurred from Benton Harbor's violation of the Lanham Act.

      b.    *Damages*

Section 35 of the Lanham Act states that

> [w]hen a violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . shall have been established in any civil action arising under this Act, the plaintiff shall be entitled . . . to recover (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) the costs of the action.  The court shall assess such profits and damages or cause the same to be assessed under its direction. . . . In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.

16

15 U.S.C. § 1117(a).  RWI notes that, without discovery, it cannot determine the Facility's gross room revenue during the period of infringement.  (Workman Aff. ¶ 50.)  Therefore, this Court shall draw upon the Facility's average monthly gross room revenue between January 1, 2003 through November 30, 2004 in order to determine the amount of damages.  RWI has provided documentation that the average monthly reported gross room revenue for that period was $71,899.77.  (FISX Property Operating Stats, attached as Ex. I to Workman Aff.)  From this amount, this Court can ascertain that Benton Harbor owed, on average, $6111.48 in Recurring Fees, calculated pursuant to the License Agreement as 8.5 percent of the average monthly gross room revenue.  (Ex. A-A at 10, 33.)  Under this calculation, RWI is entitled to receive $176,834.58 in damages for the infringement period which, trebled, amounts to $530,503.74.

**B.**     **Default Judgment Motion**

Next, this Court shall consider whether a default judgment against defendant Benton Harbor is appropriate.

1.     Jurisdiction

Before entering a default judgment against a party that has not filed responsive pleadings, "the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties."  Williams v. Life Sav. & Loan, 802 F.2d 1200, 1203 (10th Cir. 1986).

This Court has subject matter jurisdiction over the present case, pursuant to 28 U.S.C. § 1332, because RWI and Benton Harbor are citizens of different states, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  Specifically, RWI is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.  (Compl. ¶ 1.)  Benton Harbor is a corporation organized

and existing under the laws of the State of Michigan, with its principal place of business in

Benton Harbor, Michigan.[6]  (Id. at ¶ 2.)

To ascertain whether or not a court has personal jurisdiction, a federal court sitting in

diversity must conduct a two-step analysis.  First, the court must look to the forum state's long-

arm statute to determine if personal jurisdiction is permitted over the defendant.  Second, the

court must determine whether the exercise of jurisdiction violates Due Process under the

Fourteenth Amendment.  IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998);

Vetrotex Certainteed Corp. v. Consol. Fiber Glass Products Co., 75 F.3d 147, 150 (3d Cir. 1996).

In this forum, the inquiry is collapsed into a single step because New Jersey's long arm

statute permits the exercise of personal jurisdiction to the fullest limits of due process, as defined

under the Constitution of the United States.  As such, federal law defines the parameters of this

Court's in personam jurisdiction.  IMO Indus., Inc., 155 F.3d at 259.  The Fourteenth

Amendment permits a state to exercise jurisdiction over an out-of-state defendant only where

"the defendant purposefully avails itself of the privilege of conducting activities within the forum

State, thus invoking the benefits and protections of its laws."  Burger King Corp. v. Rudzewicz,

471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235 (1958)).  The plaintiff has

the burden of proving that the defendant purposefully availed itself of the forum state.  Burke v.

_____

[6] This Court also has subject matter jurisdiction as a result of RWI's Lanham Act claim, pursuant to 28 U.S.C. §§ 1331 and 1338, and 15 U.S.C. § 1121.  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks."); 15 U.S.C. § 1121(a) ("The district and territorial courts of the United States shall have original jurisdiction . . . of all actions arising under this Act, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties.").

Quartey, 969 F. Supp. 921, 924 (D.N.J. 1997).

Personal jurisdiction, however, is a right that can be waived by the parties.  Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703 (1982).  A forum selection clause in a contract is one way to effectuate this waiver.  Nat'l Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 315 (1963).

This Court has personal jurisdiction over Benton Harbor by virtue of the forum selection clause in the License Agreement, which includes a waiver of objections to personal jurisdiction.  Specifically, Section 17.6.3 of the License Agreement states that RWI "consent[s] and waive[s] [its] objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between [RWI] and [Benton Harbor]."  (Ex. A-A at 20.)

The enforceability of a forum selection clause in federal court is determined by a generally applicable federal law.  Lauro Lines S.R.L. v. Chasser, 490 U.S. 495 (1989); Jumara v. State Farm Ins. Co., 55 F.3d 873, 877 (3d Cir. 1995).  This Court must look to federal law in determining whether to enforce the forum selection clause in the License Agreement.

The Supreme Court of the United States has held that "[forum selection] clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances."  M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972).  This rule reflects the principle that courts should enforce freely negotiated contract terms, and give effect to the legitimate expectations of the parties.  M/S Bremen, 407 U.S. at 12.

Expanding on this ruling, the Third Circuit has adopted the following three step test:

19

> a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable.

Coastal Steel, 709 F.2d at 202 (quoting M/S Bremen, 407 U.S. at 12-13).  A court may refuse to enforce a forum selection clause if any of the factors have been demonstrated.  Id.

In this case, Benton Harbor consented to personal jurisdiction in New Jersey by signing, and agreeing to, the terms of the License Agreement.  Because none of the M/S Bremen factors are present here, this Court concludes that the forum selection clause is valid.  This Court has personal jurisdiction over Benton Harbor.

2.      Appropriateness of Default Judgment

On July 27, 2007, Magistrate Judge Arleo granted a motion by Benton Harbor's attorney to be relieved as counsel for Benton Harbor.  In the Letter Order, Judge Arleo ordered Benton Harbor to retain counsel by August 20, 2007, as a corporate entity cannot represent itself under the applicable law.  The letter order also stated that, if Benton Harbor failed to retain counsel by the specified date, Judge Arleo would ask this Court to strike Benton Harbor's Answer and file an entry of default against it.  To this end, a status conference was scheduled for August 21, 2007.

No party or counsel filed an appearance by August 20, 2007, or appeared on behalf of Benton Harbor at the August 21, 2007 status conference.  Accordingly, on October 24, 2007, Judge Arleo filed a R&R striking Benton Harbor's Answer and requesting the entry of default. The R&R was adopted by this Court on December 11, 2007.

Benton Harbor also failed to secure counsel to respond to the instant motion, filed on

December 14, 2007, and served via overnight delivery.  Therefore, this Court finds that default judgment is appropriate, pursuant to FED. R. CIV. P. 55(b)(2), on all counts of the Complaint.

        3.    <u>Damages</u>

Plaintiff requests the following damages: $530,503.74 in treble damages for Benton Harbor's unlawful continued use of the Ramada Marks; $27,143.81 in outstanding Recurring Fees; $118,000 in liquidated damages; pre-judgment interest on the Recurring Fees owed by Benton Harbor and the liquidated damages, for the period between December 29, 2004 through July 30, 2008, at the rate of 1.5 percent per month; and reimbursement for attorneys' fees and costs.  For the reasons stated <u>supra</u> in Section III, A, 2 of this Opinion, this Court shall grant Plaintiff's request for damages.  This Court reserves judgment on the amount of attorneys' fees and costs to be awarded to Plaintiff.

## IV.  CONCLUSION

For the reasons set forth above, this Court shall grant RWI's motion for summary judgment, against the Guarantors, as well as its motion for default judgment against Benton Harbor.


                          S/Joseph A. Greenaway, Jr.
                          JOSEPH A. GREENAWAY, JR., U.S.D.J.

July 30, 2008